**VIDEO SOFTWARE DEALERS ASSOCIATION, et al.,**
**Plaintiffs,**

v.

**Norm MALENG, et al., Defendants.**

**No. C03–1245L.**

United States District Court,
W.D. Washington,
At Seattle.

July 15, 2004.

Darren H. Lubetzky, Jenner & Block (DC), Washington, DC, David J. Burman, Perkins Coie, Seattle, WA, Deanne E. Maynard, Jenner & Block, Kathleen R. Hartnett, Jenner & Block, Paul M. Smith, Jenner & Block, Washington, DC, Signe Brunstad, Perkins Coie, Seattle, WA, for Video Software Dealers Association, Interactive Digital Software Association, Washington Retail Association, Interactive Entertainment Merchants Association, International Game Developers Association, Hollywood Entertainment Corporation, Plaintiffs.

Noel Reynolds Treat, King County Prosecuting, Attorney's Office, Oma L. La-Mothe, King County Prosecuting, Attorney's Office, William G Clark, Attorney Generals Office, Seattle, Carol A Murphy, Attorney General's Office, Criminal Justice Division, Jeffrey T. Even, Attorney General's Office, Laura J. Watson, Attorney General's Office, Olympia, WA, for Norm Maleng, Gary Locke, Christine O. Gregoire, Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANTS' CROSS–MOTION

LASNIK, District Judge.

This matter comes before the Court on "Plaintiffs' Motion for Summary Judgment" and defendants' "Cross Motion for Summary Judgment." Plaintiffs are companies and associations of persons that create, publish, distribute, sell, rent, and/or make available to the public computer and video games. Plaintiffs brought this action seeking to enjoin enforcement of RCW 9.91.180 (previously identified as Washington House Bill No. 1009, 58th Leg., Reg. Sess. (2003) and hereinafter identified as "the Act") on the ground that the Act violates the First Amendment by creating penalties for the distribution of computer and video games to minors based solely on their content and viewpoint. Similar disputes have erupted across the country as state and local governments have attempted to regulate the dissemination of violent video games to children. As of this date, no such regulation has passed constitutional muster. *See Interactive Digital Software Ass'n v. St. Louis County,* 329 F.3d 954 (8th Cir.2003); *American Amusement Mach. Ass'n v. Kendrick,* 244 F.3d 572 (7th Cir.2001); *Video Software Dealers Ass'n v. Webster,* 968 F.2d 684 (8th Cir.1992). *See also James v. Meow Media, Inc.,* 300 F.3d 683 (6th Cir.2002) (private party's attempt to impose tort liability based on the dissemination of video games fails in light of countervailing First Amendment interests); *Wilson v. Midway Games, Inc.,* 198 F.Supp.2d 167 (D.Conn. 2002) (same); *Sanders v. Acclaim Entm't, Inc.,* 188 F.Supp.2d 1264 (D.Colo.2002) (same). Having reviewed the memoranda, declarations, and exhibits submitted by the parties, having considered the arguments of counsel, and having reviewed the record as a whole,[1] the Court finds as follows:

### I. STANDING

As an initial matter, defendants argue that plaintiffs do not have standing to challenge the Act on any ground other than overbreadth because plaintiffs have not alleged that their First Amendment rights would be violated if the Act were enforced. If plaintiffs were not asserting personal injuries, they might bear the heavy burden of proving that there is no limiting construction that could be placed on the Act to avoid the alleged constitutional infirmity. *See Broadrick v. Oklahoma,* 413 U.S. 601, 610–13, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Defendants' underlying assertion is incorrect, however: plaintiffs have asserted their own First Amendment rights (Complaint at ¶ 20) and, in the context of the preliminary injunction motion, identified various injuries that they as game creators, distributors, and retailers would suffer if the Act became effective. Those potential injuries have not changed and plaintiffs have standing to challenge the constitutionality of the Act insofar as it directly affects the content and distribution of their speech. In addition, plaintiffs have standing to assert the First Amendment rights of their consumers, the minors who would be deprived of access under the Act. *See Broadrick,* 413 U.S. at 612, 93 S.Ct. 2908 (in the First Amendment area, the Supreme Court has "altered its traditional rules of standing to permit ... 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite

---

1. Defendants' motion to strike the statement of Dr. Goldstein and plaintiffs' motion for a continuance under Rule 56(f) are DENIED.

narrow specificity.' *Dombrowski v. Pfister,* 380 U.S. [479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) ]."); *American Amusement Mach. Ass'n,* 244 F.3d at 576–77 (allowing video game manufacturers to champion the First Amendment rights of children).

■ Defendants also suggest that this Court·should refrain from ruling on the constitutionality of the Act until the courts of the State of Washington have had an opportunity to construe it. In the circumstances of this case (where enforcement of the Act has been enjoined), the only way the state courts would have an opportunity to interpret the Act is through the certification process. Defendants have not, however, asked the Court to certify questions to the state Supreme Court or identified issues of state law the resolution of which would overcome the First Amendment issues discussed below. To the extent defendants are arguing that the Court should abstain from deciding the constitutional issues under *Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the significant risks of irreparable injury to plaintiffs' First Amendment rights while the parties wait for cases to wend their way through the state court system make abstention inappropriate. *See Porter v. Jones,* 319 F.3d 483, 486–87 (9th Cir.2003) ("It is rarely appropriate for a federal court to abstain under *Pullman* in a First Amendment case, because there is a risk in First Amendment cases that the delay that results from abstention will itself chill the exercise of the rights that the plaintiff seek to protect by suit.").

## II. PROTECTED SPEECH

■ The party claiming the protections of the First Amendment has the burden of showing that the conduct at issue expresses some idea or thought. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Communications designed to entertain the listener, rather than to impart information or debate public affairs, are eligible for constitutional protections. *Time, Inc. v. Hill,* 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). In evaluating a person's claim that conduct is expressive, the Court considers "whether an intent to convey a particularized message is present, and whether the likelihood is great that the message would be understood by those who viewed it." *Nordyke v. King,* 319 F.3d 1185, 1189 (9th Cir.2003) (citation and internal quotation marks omitted), *reh'g en banc denied,* 364 F.3d 1025 (9th Cir.2004).

■ The early generations of video games may have lacked the requisite expressive element, being little more than electronic board games or computerized races. The games at issue in this litigation, however, frequently involve intricate, if obnoxious, story lines, detailed artwork, original scores, and a complex narrative which evolves as the player makes choices and gains experience. All of the games provided to the Court for review are expressive and qualify as speech for purposes of the First Amendment. In fact, it is the nature and effect of the message being communicated by these video games which prompted the state to act in this sphere. As noted by the Eighth Circuit: "Whether we believe the advent of violent video games·adds anything of value to society is irrelevant; guided by the [F]irst [A]mendment, we are obliged to recognize that 'they are as much entitled to the protection of free speech as the best of literature.'" *Interactive Digital Software Ass'n,* 329 F.3d at 958 (citing *Winters v. New York,* 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840 (1948)). The Court finds that the games at issue are expressive and

qualify for the protections of the First Amendment.

■ Defendants argue that, even if the video games regulated under the Act are expressive, they fall into one of the few categories of speech that have been historically unprotected, in this case, obscenity. Defendants correctly point out that the phrase "obscene material" is not inherently limited to sexually-explicit materials. The Latin root "obscaenus" literally means "of filth" and has been defined to include that which is "disgusting to the senses" and "grossly repugnant to the generally accepted notions of what is appropriate." *See Miller v. California,* 413 U.S. 15, 18 n. 2, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Graphic depictions of depraved acts of violence, such as the murder, decapitation, and robbery of women in Grand Theft Auto: Vice City, fall well within the more general definition of obscenity. Nevertheless, the Supreme Court has found that, when used in the context of the First Amendment, the word "obscenity" means material that deals with sex. *Id.* Only "works which depict or describe sexual conduct" are considered obscene and therefore unprotected. State statutes designed to regulate obscene material must be drafted narrowly to cover only "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller,* 413 U.S. at 24, 93 S.Ct. 2607.

■ Defendants acknowledge that the Act does not regulate works that depict sexual conduct. Undaunted by the clear pronouncements of the Supreme Court regarding the limited scope of materials that are subject to regulation as obscene, defendants argue that the Court should expand the definition of obscenity to include graphic portrayals of violence. No court has accepted such an argument, probably because existing case law does not support it. In addition to the fact that the Supreme Court has expressly limited "obscenity" to include only sexually-explicit materials, the historical justifications for the obscenity exception simply do not apply to depictions of violence. Sexually-explicit materials were originally excluded from the protections of the First Amendment because the prevention and punishment of lewd speech has very little, if any, impact on the free expression of ideas and government regulation of the sexually obscene has never been thought to raise constitutional problems. *Roth v. United States,* 354 U.S. 476, 484–85, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The same cannot be said for depictions of violence: such depictions have been used in literature, art, and the media to convey important messages throughout our history, and there is no indication that such expressions have ever been excluded from the protections of the First Amendment or subject to government regulation. The Court declines defendants' invitation to expand the narrowly-defined obscenity exception to include graphic depictions of violence.

■ Finally, defendants argue that the state should be permitted to determine what speech or ideas are wholesome enough to disseminate to minors, even if the speech is protected under the First Amendment and does not satisfy the imminent lawlessness analysis of *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Defendants rely heavily on *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), to support their theory that the state can regulate any speech that is "harmful to minors." Although the Supreme Court has used a "harmful to minors" analysis to broaden the definition of obscene material, the decision in *Ginsberg* is based on the

fact that sexually-explicit material is not entitled to the protections of the First Amendment. The statute at issue in *Ginsberg* did not create an entirely new category of unprotected speech: rather, it adjusted the *Roth* definition of obscene material to capture that which is of sexual interest to minors.

■ Defendants have not identified, and the Court has not found, any case in which a category of otherwise protected expression is kept from children because it might do them harm. Defendants' cannot prohibit the dissemination of otherwise protected speech simply because the audience consists of minors. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideals or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when the government seeks to control the flow of information to minors." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

### III. STRICT SCRUTINY

■ Because the video and computer games at issue in this litigation are expressive speech that is entitled to the full protections of the First Amendment, strict scrutiny applies. It is undisputed that the Act seeks to regulate plaintiffs' speech based on its content (as opposed to the time, manner, and place in which it is published).[2] Content-based regulations are

presumptively invalid (*R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)) and are rarely permitted (*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)). Under this analysis, the Act will be upheld only if defendants can show that the regulation is necessary to serve a compelling state interest and that it is narrowly tailored to achieve that interest. *Republican Party of Minn. v. White*, 536 U.S. 765, 774–75, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

### A. Compelling State Interest

■ In enacting House Bill 1009, the Legislature noted two compelling interests: (1) "to curb hostile and antisocial behavior in Washington's youth" and (2) "to foster respect for public law enforcement officers." Apparently recognizing the constitutional problems associated with attempting to regulate speech because it is anti-government, defendants have merged these two purposes, arguing that "[t]he Legislature was motivated to curb hostile and antisocial behavior of youths, including violence and aggression toward law enforcement officers." Response at 21.

■ Federal courts have repeatedly recognized that the state has a legitimate and compelling interest in safeguarding both the physical and psychological well-being of minors. *See Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989); *Interactive Digital*, 329 F.3d at 958. One

---

2. In a footnote, defendants acknowledge that the Act is a content-based restriction, but argue that the restrictions are viewpoint neutral. It is not clear what relevance this distinction has in this case. In order to justify restrictions on speech in a limited public forum, the state must show that it has not discriminated on the basis of viewpoint. *See Good News Club v. Milford Central Sch.*, 533 U.S. 98, 106–07, 121 S.Ct. 2093, 150 L.Ed.2d

151 (2001). The forum at issue does not fall within that category, however, and the fact that the restriction is content-based is sufficient to give rise to strict scrutiny. In addition, the fact that the Act regulates only speech that is anti-law enforcement (*i.e.*, depicting violence against law enforcement officers is prohibited but the portrayal of the same acts against children is not) makes the claim of viewpoint neutrality doubtful.

could argue that the Act is intended to protect youth from psychological desensitization and the development of aggressive feelings/behaviors. Simply identifying a compelling state interest is not enough, however:

> When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." *Quincy Cable TV, Inc. v. F.C.C.*, 768 F.2d 1434, 1455 (D.C.Cir.1985). It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way. *See Edenfield v. Fane*, 507 U.S. 761, 770–71, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993); *Los Angeles v. Preferred Communications, Inc.*, 476 U.S. [488, 496, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986)] ("This Court may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity") (internal quotation marks omitted) . . . .

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664–65, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). *See also Playboy*, 529 U.S. at 816–17, 120 S.Ct. 1878. If the state is able to show that the psychological well-being of Washington's youth is in gen-

uine jeopardy, it has the additional burden of showing that the regulation is narrowly tailored to address that problem "without unnecessarily interfering with First Amendment freedoms." *Sable Communications*, 492 U.S. at 126, 109 S.Ct. 2829.

■ The disease the Legislature apparently seeks to cure is the game-related increase in hostile and antisocial behavior in minors, particularly toward law enforcement officers. Defendants rely heavily on the Legislature's finding that "there has been an increase in studies showing a correlation between exposure to violent video and computer games and various forms of hostile and antisocial behavior." [3] In general, courts must "accord substantial deference to the predictive judgments" of the legislature. *Turner Broad. Sys.*, 512 U.S. at 665, 114 S.Ct. 2445 (citing *Columbia Broadcasting, Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 103, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)). Where the challenged legislation restricts or limits freedom of speech, however, the courts must ensure that the legislature's judgments are based on reasonable inferences drawn from substantial evidence. *Turner Broad. Sys.*, 512 U.S. at 666, 114 S.Ct. 2445; *Century Communications Corp. v. F.C.C.*, 835 F.2d 292, 304 (D.C.Cir.1987) ("when trenching on [F]irst [A]mendment interests, even incidentally, the government must be able to adduce either empiri-

---

3. To the extent the Act is designed to prevent future, rather than immediate, acts of violence, the Supreme Court and the Ninth Circuit have expressly rejected the idea that the possibility of future harm can justify the regulation of speech. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) ("The prospect of crime, however, by itself does not justify laws suppressing protected speech."); *Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*, 360 U.S. 684, 689, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959) ("Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of

the law, not abridgment of the rights of free speech.") (internal quotation marks and citation omitted); *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1199–1200 (9th Cir.1989) ("Numerous cases establish that speech may not be suppressed simply because it is offensive. . . . Instead, a large body of case law sharply limits the reach of these categories by requiring that the speech be directed toward and likely to incite imminent unlawful action.") (internal citations omitted). Defendants have expressly disavowed any attempt to satisfy the *Brandenburg* analysis and cannot justify the Act by asserting the possibility of future harm.

cal support or at least sound reasoning on behalf of its measures").

Defendants have produced expert reports and a number of studies which find a correlation between a minor's exposure to depictions of violence and the development of aggressive tendencies and anti-social behaviors. Plaintiffs have produced their own expert report, a like number of studies, and a presentation by the State's Department of Health which conclude that no causal connection between playing violent video games and real-life violence has been established. As discussed above, this Court must ensure that the predictive judgments that prompted the legislature to act are based on reasonable inferences drawn from substantial evidence. Having reviewed all of the evidence provided by the parties in the light most favorable to defendants, the Court finds that defendants have presented research and expert opinions from which one could reasonably infer that the depictions of violence with which we are constantly bombarded in movies, television, computer games, interactive videos games, *etc.*, have some immediate and measurable effect on the level of aggression ·experienced by some viewers and that the unique characteristics of video games, such as their interactive qualities, the first-person identification aspect, and the repetitive nature of the action, makes video games potentially more harmful to the psychological well-being of minors than other forms of media. In addition, virtually all of the experts agree that prolonged exposure to violent entertainment media is one of the constellation of risk factors for aggressive or anti-social behavior (other factors include family problems, problems with peers at school and in the neighborhood, biological factors, *etc.*).

Nevertheless, the Court finds that the current state of the research cannot support the legislative determinations that underlie the Act because there has been no showing that exposure to video games that "trivialize violence against law enforcement officers" is likely to lead to actual violence against such officers. Most of the studies on which defendants rely have nothing to do with video games, and none of them is designed to test the effects of such games on the player's attitudes or behavior toward law enforcement officers. Where the studies do involve exposure to video games, the subjects are often asked to play games selected by the researcher and are then evaluated for behaviors that serve as proxies for actual aggression. Assuming, for sake of argument, that the frustrations inherent in learning a new game or console system are not responsible for any measurable increase in hostility, neither causation nor an increase in real-life aggression is proven by these studies.[4] That is not to say that the video games presented to the Court are unobjectionable. To the contrary, many of them promote hateful stereotypes and portray levels of violence and degradation that are repulsive. The Court, along with virtually every entity that has considered this issue, hopes that more research is done to determine the long-term effects of playing violent video games on children and adolescents. Although "[w]e do not demand of legislatures scientifically certain criteria of legislation" (*Ginsberg*, 390 U.S. at 642, 88 S.Ct. 1274 (internal quotation marks omitted)), given the state of the existing re-

---

4. Even if one accepts the basic premise that interactive games involving repetitive actions "teach" the player certain skills, the· evidence as it currently exists suggests only that players are taught improved reaction time, eye/hand coordination, and how to score points in the game. Dr. Provenzo's concern that a person playing Grand Theft Auto: Vice City will learn how to shoot a police officer is little more than conjecture: a proven ability to manipulate a controller and push buttons will not teach a person to load, aim, or fire a gun.

search in this area, the Court finds that the Legislature's belief that video games cause violence, particularly violence against law enforcement officers, is not based on reasonable inferences drawn from substantial evidence.

In the absence of substantial evidence supporting the Legislature's prediction that the regulation of violent video games will curb hostile and anti-social behavior in youths, particularly toward law enforcement officers, it is virtually impossible to conclude that "the regulation will in fact alleviate [the identified] harms in a direct and material way." *Turner Broad. Sys,* 512 U.S. at 664–65, 114 S.Ct. 2445. Defendants argue that the Act is just the first step toward stamping out all game-related aggression and that they should not be faulted for focusing their first regulatory efforts on just one type of violence. The problem with this approach is that the Act is both over-inclusive and under-inclusive. If the Legislature hopes to prevent game-inspired hostility toward law enforcement officers, the Act sweeps too broadly in that it would restrict access to games that reflect heroic struggles against corrupt regimes, involve accidental injuries to officers, and/or contain disincentives for violence against law enforcement officers. At the same time, the Act is too narrow in that it will have no effect on the many other channels through which violent representations are presented to children. As a step toward reducing game-related aggression as a whole, the Act would be particularly ineffective because it would not keep minors from playing some of the most offensive and violent video games. Only those games involving law enforcement officers would be off-limits, leaving vile portrayals of mutilation and murder of other persons (often women and minorities) unregulated and widely available to minors. Even if defendants were able to show a causal connection between violent video games and real-life aggres-

sion in minors, the record does not support a finding that the Act is likely to curb such aggression in a direct and material way

## B. Narrowly Tailored to Further Compelling State Interest

Where strict scrutiny applies, courts strike down speech restrictions "[i]f a less restrictive alternative would serve the Government's interest." *Playboy,* 529 U.S. at 813, 120 S.Ct. 1878. Even the less exacting test applied to content-neutral regulations requires that the state show "that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner Broad. Sys.,* 512 U.S. at 665, 114 S.Ct. 2445 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). The Court finds that, even if the state's interest in preventing video game-related violence toward law enforcement officers were compelling, the limitations imposed by the Act impact more constitutionally protected speech than is necessary to achieve the identified ends and are not the least restrictive alternative available.

As this litigation has progressed, defendants and their experts have asserted that "ultra-violent" video games cause aggression and must be regulated in order to further the state's compelling interests. The Act, however, does not simply regulate games "in which a high level of realistic violence is sustained" throughout play (Opposition at 2) and is not limited to the most vile portrayals of violence. Rather, the Act regulates all "video or computer game[s] that contain[ ] realistic or photographic-like depictions of aggressive conflict in which the player kills, injures, or otherwise causes physical harm to a human form in the game who is depicted, by dress or other recognizable symbols, as a

public law enforcement officer." This definition is expansive and does not attempt to regulate the dissemination of video games on the basis of the extremity of the violence portrayed—even the most loathsome acts are not covered as long as the victim is anyone other than a "public law enforcement officer." Where the victim is identified as a law enforcement officer, however, the distribution of games that contain even relatively common forms of violence, reflect laudable struggles against evil authority figures, depict unintentional harm, or have very limited violent content, is restricted. In short, the regulation of speech at issue here is not limited to the ultra-violent or the patently offensive and is far broader than what would be necessary to keep filth like Grand Theft Auto III and Postal II out of the hands of children.

█ For all of the foregoing reasons, the Act "does not satisfy the rigorous constitutional standards that apply when government attempts to regulate expression." *Erznoznik*, 422 U.S. at 217, 95 S.Ct. 2268. Given the nationwide, on-going dispute in this area, it is reasonable to ask whether a state may ever impose a ban on the dissemination of video games to children under 18. The answer is "probably yes" if the games contain sexually explicit images (*see Ginsberg*, 390 U.S. at 634–38, 88 S.Ct. 1274; *American Amusement Mach.*, 244 F.3d at 574–76, 579), and "maybe" if the games contain violent images, such as torture or bondage, that appeal to the prurient interest of minors (*see Miller*, 413 U.S. at 24, 93 S.Ct. 2607). State attempts to regulate ultra-violent video games that have no sexual component have failed for a number of reasons, including those set forth above. While the Court cannot give advisory opinions on cases or controversies not before it, future attempts to regulate video games on the basis of their content will be analyzed under a framework such as the Court has undertaken here. Key considerations will be:

— does the regulation cover only the type of depraved or extreme acts of violence that violate community norms and prompted the legislature to act?

— does the regulation prohibit depictions of extreme violence against all innocent victims, regardless of their viewpoint or status? and

— do the social scientific studies support the legislative findings at issue?

## IV. VAGUENESS

█ Legislative enactments must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Defendants steadfastly refuse to identify the range of video games the state seeks to regulate under the Act, leaving many unanswered questions for the Court, retailers, and authors to ponder. The language of the statute itself is broad and covers all "video or computer game[s] that contain[ ] realistic or photographic-like depictions of aggressive conflict in which the player kills, injures, or otherwise causes physical harm to a human form in the game who is depicted, by dress or other recognizable symbols, as a public law enforcement officer." Would a game built around The Simpsons or the Looney Tunes characters be "realistic" enough to trigger the Act? Is the level of conflict represented in spoofs like the Dukes of Hazard sufficiently "aggressive?" Do the Roman centurions of Age of Empires, the enemy officers depicted in Splinter Cell, or the conquering forces of Freedom Fighters qualify as "public law enforcement officers?" When pressed at oral argument, defense counsel was unable to determine whether firefighters were "public law enforcement officers,"

suggesting that such issues should be determined by the state courts. As noted above, however, there is a substantial risk that plaintiffs' exercise of their First Amendment rights would be chilled while each issue of interpretation is presented to the state courts, thereby depriving plaintiffs of the very rights they seek to protect in this suit.

The problem is not, as defendants suggest, that a retail clerk might be unaware of the contents of a particular game: such a situation may give rise to a defense to an action brought under the Act but it is not a vagueness issue. The real problem is that the clerk might know everything there is to know about the game and yet not be able to determine whether it can legally be sold to a minor. The effects of such vagueness are particularly troublesome where First Amendment rights are implicated. Not only is a conscientious retail clerk (and her employer) likely to withhold from minors all games that could possibly fall within the broad scope of the Act, but authors and game designers will likely "steer far wider of the unlawful zone ... than if the boundaries of the forbidden area were clearly marked." *Grayned*, 408 U.S. at 109, 92 S.Ct. 2294 (internal quotation marks omitted). Given the fact that rights of free expression are at stake, the Court finds that the Act is unconstitutionally vague.

## V. PRIOR RESTRAINT

Defendants' request for dismissal of plaintiffs' claim that the Act constitutes a prior restraint on speech is unopposed. Count III of plaintiffs' complaint is therefore, dismissed.

## VI. EQUAL PROTECTION

Defendants' request for dismissal of plaintiffs' claim that the Act violates their right to equal protection under the law is unopposed. Count IV of plaintiffs' complaint is therefore, dismissed.

For all of the foregoing reasons, defendants and their officers, employees, and representatives are permanently enjoined from enforcing RCW 9.91.180. Counts III and IV of plaintiffs' complaint are hereby DISMISSED. The Clerk of Court is directed to enter judgment in the above-captioned matter in favor of plaintiffs and against defendants.