[No. B183820. Second Dist., Div. Eight. Sept. 25, 2006.]

KIERIN KIRBY, Plaintiff and Appellant, v.
SEGA OF AMERICA, INC., et al., Defendants and Respondents.

COUNSEL

Blecher & Collins, Maxwell M. Blecher and Courtney A. Palko for Plaintiff and Appellant.

Baker & McKenzie, Tod L. Gamlen, Keith L. Wurster and Christopher J. Keller for Defendants and Respondents.

OPINION

BOLAND, J.—

## SUMMARY

A celebrity sued distributors of a video game alleging that, in creating a character in the video game, the distributors misappropriated her likeness and identity in violation of state and federal law. The distributors moved for summary judgment asserting the First Amendment provided a complete defense to each of the celebrity plaintiff's claims. The trial court agreed, granted the motions, and subsequently awarded the distributors mandatory attorney's fees, as prevailing parties under Civil Code section 3344, subdivision (a). We affirm the judgment and remand for a determination regarding the amount of attorney's fees.

## FACTUAL AND PROCEDURAL BACKGROUND

From 1986 to approximately 1995, appellant Kierin Kirby, professionally known as "Lady Miss Kier," "Miss Kier" or "Lady Kier" (hereafter, Kirby) was the lead singer of a retro-funk-dance musical group known as "Deee-Lite" which was popular in the early 1990's. Deee-Lite made five albums which were distributed and sold throughout the world. The band was best known for its song "Groove is in the Heart" from its first album released in

1990. The song's music video, which received extensive airplay on MTV, features band members clad in "funky retro outfits, vivid graphics, groovy dance moves, a futuristic setting and an overall party feel."

In addition to being a musician, Kirby is a dancer, artist, choreographer and fashion designer. Kirby insists that, as "Lady Kier," she developed a "specific, distinctive . . . look," of a "fashionable, provocative, and funky diva-like artistic character." Kirby claims her "unique public identity," which combines retro and futuristic visual and musical styles, results from her signature costumes and lyrical expression. Kirby's costumes included platform shoes, kneesocks, brightly colored formfitting clothes and unitards, short pleated or cheerleader-type skirts, bare midriffs, cropped tops with words or a numeral written on the chest, space or other helmets, a blue backpack, and red/pink hair worn in a "page-boy flip" held back by a headband, pigtails and other styles. Kirby alleges her "signature" lyrical expression, with which she introduces herself in the opening of the music video for "Groove is in the Heart," and which is included in three of her songs, is "ooh la la." Kirby claims substantial, commercially valuable goodwill in her sound, appearance, persona and likeness.

Deee-Lite disbanded by the mid-1990's. Since then, Kirby has been involved in preparing—but has not released—an album of her own, and does not pursue publicity or grant press interviews. She alleges she has been and is regularly approached by advertisers and manufacturers interested in licensing her name and likeness to sell products. Kirby declines most offers, but derives some income from commercial endorsements.

Respondents are distributors of a video game called "Space Channel 5" (SC5, or the game). SC5 was created from 1997–1999 by Takashi Yuda, an employee of Sega Japan, and was released in Japan in December 1999. Yuda originally conceived the main character as a male, but changed the character to a female in order to develop a video game to appeal to girls. Yuda testified the name "Ulala" was a derivative of a Japanese name "Urara," modified to make it easier for English-speakers to pronounce. Yuda claims he developed the Ulala character based on the "anime" style of Japanese cartoon characters, and denied using Kirby as a reference. Ulala has six main dance moves (up, down, right, left, forward and backward). The character's dance moves were created by Nahoko Nezu, a Japanese choreographer and dancer. Nezu's dance moves were hers alone. At the time she created the moves, Nezu did not know Kirby, and had not ever heard of her. Nezu created and performed dance moves for Ulala at Yuda's direction. He videotaped the moves and used the tapes to create Ulala's dance moves in the game. The musical theme song for SC5 is "Mexican Flyer." That song, written in the 1960's, is performed by composer Ken Woodman. The music is not based on, or used in reference to, any music by Deee-Lite or Kirby.

The game, set in outer space in the 25th century, features the computer-generated image of a young, fictional, elongated and extremely thin female reporter named "Ulala" who works for a news channel called Space Channel 5. In the game, Ulala wears a few different costumes, but is primarily seen in an almost entirely orange outfit which includes a midriff-exposing top bearing the numeral "5," a miniskirt, elbow-length gloves, and stiletto-heeled, knee-high platform boots. Her hot pink hair is always worn in short pigtails placed high on the back of her head, and she wears a blue headset and jet pack and a blue gun holster strapped to her right thigh. Orange and blue were chosen as the primary colors for Ulala's costume because orange is the official color of Dreamcast, and the corporate color of Sega Japan is blue.

In the game, Ulala is dispatched to investigate an invasion of Earth by dance-loving aliens who shoot earthlings with ray guns, causing them to dance uncontrollably. During her investigation, Ulala encounters the aliens and competitor reporters. The player attempts to have Ulala match the dance moves of the other characters. If successful, the player acquires points, eliminates certain characters, and causes others to become part of Ulala's dance troupe. The player moves to higher levels of more difficult play until he or she reaches a final level and a surprise ending to Ulala's story. One character at the final level is known as "Space Michael." It was created to resemble the celebrity Michael Jackson, who performed the character's voice and receives credit in the game.

Several promotional products are associated with the game. Sega produced a giveaway promotional video with samples of music from SC5. Sega also sublicensed the sale of three Ulala-related products in the United States: (1) a strategy guide for playing SC5; (2) a lunch box displaying characters from the game, including Ulala; and (3) a "Hot Wheels" car containing a picture of Ulala.

Respondent Sega of America, Inc. (Sega), released a "localized" version of the game in North America in June 2000. The localized North American version differs from the Japanese version in that voices are different, and the language is changed to English.

In July 2000, Kirby was contacted by PD*3 Tully Co. (PD3), a firm retained by a subsidiary of Sega Japan, in connection with its effort to launch a version of SC5 in England. PD3 was considering using one of several music videos or songs, including "Groove is in the Heart," to promote the game. PD3 contacted Kirby to determine if she was interested in promoting SC5 in England and, possibly, Europe. Kirby was not.

Under a license granted by Sega Japan, respondent THQ, Inc. (THQ), was authorized to release and market a handheld version of SC5 in June 2003 for

use on the Nintendo Game Boy Advance platform. Later that year, respondent Agetec, Inc. (Agetec), received Sega's authorization to market a special edition of the game for the "PlayStation 2" platform.[1]

Kirby initiated this action in April 2003. The operative second amended complaint alleges causes of action for: (1) common law infringement of the right of publicity; (2) misappropriation of likeness (Civ. Code, § 3344); (3) violation of the Lanham Act (15 U.S.C. § 1125(a)); (4) unfair competition (Bus. & Prof. Code, § 17200); (5) interference with prospective business advantage; and (6) unjust enrichment. Kirby alleged respondents wrongfully used her name, likeness and identity in developing and marketing the game and, specifically, its Ulala character.

Sega, Agetec and THQ each moved for summary judgment asserting Kirby could not establish all elements of her claims and, even if she could, the First Amendment provided a complete defense to the entire action.[2] The motions were granted after the trial court found all claims constitutionally foreclosed.

Respondents subsequently moved for a "mandatory" award of attorney's fees in the amount of approximately $763,000, collectively. (Civ. Code, § 3344, subd. (a).) Kirby opposed the motion, arguing the "mandatory" fee provision of Civil Code section 3344 created public policy concerns. She also asserted the amount of fees sought was unreasonable, any fees awarded must be apportioned among the state claims, and no fees should be awarded on the federal claim. The trial court declined to award fees on the Lanham Act claim and reduced the fee award to approximately $608,000, but granted the remainder of the motion. This appeal followed.

## DISCUSSION

1. *Standard of review.*

The standard of review articulated by the Supreme Court applies in this case. In *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [107 Cal.Rptr.2d 841, 24 P.3d 493], the Supreme Court described a party's burdens on summary judgment. "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to

---

[1] The special edition consisted of SC5, originally published for the Dreamcast platform, and a sequel, SC5 Part 2, which had been released in Japan for both the Dreamcast and PlayStation 2 platforms.

[2] Sega also argued the action was barred by the statute of limitations, and Agetec and THQ asserted the defense of laches. The trial court declined to address those arguments, which are not at issue in this appeal.

judgment as a matter of law." (*Id.* at p. 850.) " 'That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. [Citation.] There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . . [Citation.]' " (*TrafficSchoolOnline, Inc. v. Clarke* (2003) 112 Cal.App.4th 736, 738, 739 [5 Cal.Rptr.3d 408].) A defendant moving for summary judgment satisfies its burden of showing a claim lacks merit if the defendant can show one or more elements of a cause of action cannot be established because the plaintiff does not possess and cannot reasonably obtain the evidence necessary to establish the claim, or a complete defense to that cause of action exists. (Code Civ. Proc., § 437c, subds. (*o*)(2), (p)(2).); *Aguilar, supra,* 25 Cal.4th at pp. 849, 854–855.) If this burden of production is met, the burden shifts to the plaintiff to set forth specific facts sufficient to establish a prima facie showing of the existence of a triable material issue of fact. (Code Civ. Proc., § 437c, subds. (*o*)(2), (p)(2); *Aguilar, supra,* 25 Cal.4th at p. 854.)

In cases involving free speech, a speedy resolution is desirable because protracted litigation may chill the exercise of First Amendment rights. For that reason, summary judgment is a favored remedy in free speech cases. (*Winter v. DC Comics* (2003) 30 Cal.4th 881, 891–892 [134 Cal.Rptr.2d 634, 69 P.3d 473] (*Winter*); *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 228 [74 Cal.Rptr.2d 843, 955 P.2d 469].) Indeed, in an appropriation case not dissimilar from this one, the Supreme Court instructed that "courts can often resolve the question as a matter of law simply by viewing the work in question and, if necessary, comparing it to an actual likeness of the person or persons portrayed. Because of these circumstances, an action presenting this issue is often properly resolved on summary judgment . . . ." (*Winter, supra,* 30 Cal.4th at pp. 891–892.) The trial court's decision to enter summary judgment is reviewed de novo. However, if the decision is correct on any ground, the judgment must be upheld regardless of the reasons given by the trial court. (*TrafficSchoolOnline, Inc. v. Clarke, supra,* 112 Cal.App.4th at pp. 738–739.)

2. *Material issues of fact exist as to whether Kirby's likeness or identity were appropriated.*

    a. *The state statutory and common law claims of appropriation.*

Kirby alleges both a common law and statutory appropriation claim, a claim for violation of the Lanham Act, and several claims related to unfair competition. Her claims are predicated on the same underlying misconduct, i.e., respondents' alleged misappropriation and exploitation of Kirby's likeness or identity as depicted by the game's Ulala character.

In the context of a celebrity, the "invasion of privacy" tort for appropriation turns on a right of publicity arising from commercially exploitable opportunities embodied in the plaintiff's likeness. (*Baugh v. CBS, Inc.* (N.D.Cal. 1993) 828 F.Supp. 745.) The cause of action may be both common law and statutory. The elements of a common law action are the unauthorized use of the plaintiff's identity to the defendant's advantage by appropriating the plaintiff's name, voice, likeness, etc., commercially or otherwise, and resulting injury. (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 417, fn. 6 [198 Cal.Rptr. 342].)

The statutory claim provides: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." (Civ. Code, § 3344, subd. (a) (section 3344, subdivision (a)).) The legislative prohibition against the unauthorized appropriation of one's likeness was intended to complement, not supplant, common law claims for "right of publicity." (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 391 [106 Cal.Rptr.2d 126, 21 P.3d 797] (*Comedy III*); *Eastwood v. Superior Court, supra*, 149 Cal.App.3d at pp. 416–417.) The common law and statutory claims are similar but not identical, but both are involved here. A statutory cause of action for appropriation not only encompasses the common law elements, it requires a knowing use of the plaintiff's name, likeness, etc. (*Eastwood v. Superior Court, supra*, 149 Cal.App.3d at pp. 417–418; § 3344, subd. (a).) The privacy invasion is actionable under either the statute or common law regardless of whether the purpose is commercial. (See *KNB Enterprises v. Matthews* (2000) 78 Cal.App.4th 362, 367–368, fn. 5 [92 Cal.Rptr.2d 713].)

Kirby repeatedly insists the trial court found, as a matter of law, that her "likeness and identity had been misappropriated." Her insistence is not supported by the record. The trial court found only the existence of material factual issues as to whether, by creating Ulala, respondents misappropriated Kirby's likeness and identity. Our review of the record reveals the court's conclusion was correct.

The misappropriation of one's "likeness" refers to a person's visual image. (*Midler v. Ford Motor Co.* (9th Cir. 1988) 849 F.2d 460, 463.) Ulala resembles Kirby in certain respects. Certain of Ulala's characteristics and computer-generated features resemble Kirby's. Both images are thin, and have similarly shaped eyes and faces, red lips and red or pink hair. Both wear brightly-colored, formfitting clothing, including short skirts and platform

shoes in a 1960's retro style. In addition, Ulala's name is a phonetic variant of "ooh la la," a phrase often used by Kirby and associated with Kirby. Finally, as the trial court pointed out, both Kirby and Ulala used the phrases "groove," "meow," "dee-lish," and "I won't give up." These similarities support Kirby's contention her identity was misappropriated.

However, Ulala and Kirby also differ in significant respects. Although Ulala dons assorted costumes in the game, she is seen most often with her hair in short, high pigtails, wearing an orange cropped top bearing the numeral "5" and orange miniskirt, orange gloves and boots with stiletto heels, a blue ray-gun holster strapped to her thigh, and a blue headset and jet pack. Kirby asserts she often wears short skirts, crop tops with numbers, elbow-length gloves, pigtails and space helmets. Kirby, as the record reflects, is found more frequently in formfitting body suits, with her hair shaped into a pageboy flip, held back with a headband. And, unlike Ulala, when Kirby wears her hair in pigtails, the pigtails not only are longer than Ulala's, but Kirby has tendrils of hair draping over her forehead which she holds back with clips. Kirby concedes she has no singular identity, her appearance and visual style are "continually moving," and she "is not the type of artist that wants to do the same thing every time." This lack of stasis is inconsistent with a claim of appropriation. Moreover, unlike the game, which is set in outer space several centuries in the future, Kirby's fashion approach harkens back to a retro 1960's style, and neither her videos nor photographs relate to outer space.

Notwithstanding the differences between Kirby and Ulala, we agree with the trial court that a material factual issue exists as to whether respondents misappropriated Kirby's likeness. Ulala's facial features, her clothing, hair color and style, and use of certain catch phrases are sufficiently reminiscent enough of Kirby's features and personal style to suggest imitation. In addition, although no evidence indicates Kirby's likeness was actually used to create Ulala, Kirby was specifically asked by a Sega affiliate in 2003 to endorse SC5. This solicitation suggests Sega knew of Kirby and believed her celebrity association would benefit the release of the European version of the game.

The differences also give rise to a factual issue on the common law claim of misappropriation of Kirby's identity. Again, Kirby's admission that she possesses no singular identity militates against a successful claim of appropriation. (Compare *White v. Samsung Electronics America, Inc.* (9th Cir. 1992) 971 F.2d 1395, 1399 [Nonconsensual use of robotic image of celebrity Vanna White, dressed in wig, gown and jewelry regularly worn by White, turning letters on a game show set designed to look like the *Wheel of Fortune*, constitutes common law appropriation of celebrity's singular identity].) In

addition, we agree with the trial court that Ulala's limited and consistently short and choppy dance movement and style differ markedly from Kirby's, a finding consistent with Sega's claim that Ulala's dance moves were created by a dancer who knew nothing of Kirby. Nevertheless, the differences are sufficient to give rise to a triable factual issue on the common law claim as well.[3]

### b. *The Lanham Act.*

The Lanham Act is the federal equivalent of a right of publicity claim. It protects against use of a celebrity's image or persona in connection with a product in a manner likely to falsely imply a celebrity product endorsement. (*ETW Corp. v. Jireh Pub., Inc.* (6th Cir. 2003) 332 F.3d 915, 924 (*ETW*).) Critical to a Lanham Act claim is the likelihood reasonable consumers will be confused about the celebrity's endorsement. (332 F.3d at pp. 925–926.) For reasons discussed above, we agree with the trial court's finding that "[t]he same issues of fact concerning likeness and identity which support [Kirby's] appropriation claims also support her Lanham Act claim. There is a question of fact that [Kirby's] identity, though constantly evolving, has been appropriated for SC5."[4]

### 3. *The First Amendment affords a complete defense to Kirby's claims.*

Respondents contend here, as they did below, that their right of free expression under the First Amendment of the United States Constitution and the even greater speech protections afforded by the California Constitution, article I, section 2, provide a complete defense to Kirby's claims. (See *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341] [Cal. Const. provides broader speech protection than does U.S. Const.].) The trial court agreed, as do we.

The freedom of expression protected by the First Amendment exists to preserve an uninhibited marketplace of ideas and to further individual

---

[3] Kirby's remaining state law claims—unfair competition in violation of Business and Professions Code section 17200, interference with prospective business advantage and accounting—ride the coattails of her privacy claims. That is, each is predicated on the unauthorized appropriation of her likeness or identity. As such, material issues of fact exist as to these claims as well.

[4] Ordinarily, a Lanham Act claim requires analysis of the key element of false endorsement which is not required by the state law appropriation claims. In other words, the court must evaluate the likelihood an ordinary consumer would reasonably believe the celebrity endorsed or sponsored the product or service at issue. (See, e.g., *White v. Samsung Electronics America, Inc., supra,* 971 F.2d at p. 1401.) That evaluation need not be conducted here. The test does not apply in a case such as this, in which there is a colorable defense that the use of the celebrity's likeness or identity is entitled to First Amendment protection. (*ETW, supra,* 332 F.3d at p. 926.)

rights of self-expression. (*Winter, supra,* 30 Cal.4th at p. 887.) The protections may extend to all forms of expression, including written and spoken words (fact or fiction), music, films, paintings, and entertainment, whether or not sold for a profit.[5] (*Comedy III, supra,* 25 Cal.4th at pp. 387, 406; *Winter, supra,* 30 Cal.4th at p. 888; *ETW, supra,* 332 F.3d at p. 924.) Video games are expressive works entitled to as much First Amendment protection as the most profound literature. (*Interactive Digital Software v. St. Louis County* (8th Cir. 2003) 329 F.3d 954, 956–958; *Video Software Dealers Ass'n v. Maleng* (W.D.Wn. 2004) 325 F.Supp.2d 1180, 1184–1185.)

■ As this case illustrates, a tension frequently exists between the First Amendment's goal of fostering a marketplace of ideas and respect for individual expression, and a celebrity's right of publicity. In *Comedy III* and again in *Winter,* the Supreme Court addressed the balance between a celebrity's right to control the commercial exploitation of his or her likeness or identity and the First Amendment right of free expression. (See *Comedy III, supra,* 25 Cal.4th at p. 400; *Winter, supra,* 30 Cal.4th at pp. 887–888.) In *Comedy III,* the court held a defendant may raise the First Amendment as an affirmative defense to an allegation of appropriation if the defendant's work " 'adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . . . [Citation.]' " (*Comedy III, supra,* 25 Cal.4th at p. 404.) In other words, the new work must contain significant "transformative elements." (*Id.* at pp. 406–407.) The "transformative" test protects the right of publicity. It continues to shield celebrities from literal depictions or imitations for commercial gain by works which do not add significant new expression. Moreover, a work which has been "transformed" is less likely to interfere with the economic interests protected by the right of publicity, because a distorted image of a celebrity is a poor substitute for more conventional forms of celebrity depictions, and thus less likely to threaten the market for celebrity memorabilia. (*Comedy III, supra,* 25 Cal.4th at p. 405.)

The transformative test is straightforward: The "inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question." (*Comedy III, supra,* 25 Cal.4th at p. 406.) If the "product containing celebrity's likeness is so transformed that it has become primarily the defendant's own expression" of what he or she is trying to create or portray, rather than the celebrity's likeness, it is protected. (*Id.* at pp. 406–407.) Applying this test in *Comedy III,* which involved

---

[5] Even commercial speech receives significant First Amendment protection, unless it is false and misleading, in which case it receives no protection. (See *Comedy III, supra,* 25 Cal.4th at p. 396.)

drawings depicting The Three Stooges, and T-shirts made from those draw-ings, the court concluded the drawings and T-shirts were not entitled to First Amendment protection. The artist who created them, while highly skilled, contributed nothing other than a trivial variation that transformed the draw-ings from literal likenesses of the three actors. (25 Cal.4th at pp. 408–409.)

The Supreme Court applied the transformative test again two years later in *Winter*. In that case, the defendant published a series of comics featuring two half-worm, half-human characters based on singers Edgar and Johnny Winter. Both characters had long white hair and albino features similar to the Winter brothers, while one wore a hat similar to one often worn by Johnny Winter. (*Winter, supra,* 30 Cal.4th at p. 886.)

The Winter brothers sued for statutory appropriation and lost. Applying the transformative test, the court found the comic depictions contained significant expressive content beyond the Winters' mere likenesses. (*Winter, supra,* 30 Cal.4th at p. 890.) The Winters were merely part of the raw material from which the comics' plot and characters were fashioned. In addition, the characters were distorted pictures of the Winters for the purpose of lampoon, parody or caricature. In short, and in stark contrast to the near literal depictions of the Three Stooges in *Comedy III*, the comic book characters depicted were "fanciful, creative characters, not pictures of the Winter brothers." (*Id.* at p. 892.)

Applying the comparison required by *Comedy III* and *Winter* to the evidence in the record, we agree with the trial court that, notwithstanding certain similarities, Ulala is more than a mere likeness or literal depiction of Kirby. Ulala contains sufficient expressive content to constitute a "transforma-tive work" under the test articulated by the Supreme Court. First, Ulala is not a literal depiction of Kirby. As discussed above, the two share similarities. However, they also differ quite a bit: Ulala's extremely tall, slender computer-generated physique is dissimilar from Kirby's. Evidence also indi-cated Ulala was based, at least in part, on the Japanese style of "anime." Ulala's typical hairstyle and primary costume differ from those worn by Kirby who varied her costumes and outfits, and wore her hair in several styles. Moreover, the setting for the game that features Ulala—as a space-age reporter in the 25th century—is unlike any public depiction of Kirby. Finally, we agree with the trial court that the dance moves performed by Ulala—typically short, quick movements of the arms, legs and head—are unlike Kirby's movements in any of her music videos. Taken together, these differences demonstrate Ulala is "transformative," and respondents added creative elements to create a new expression.

Conceding the game adds "new expression," Kirby nevertheless contends respondents violated her right of privacy because, unlike the comics in *Winter*

which were intended to "poke fun," the game lacks any "element of caricature, lampoon, or parody." Notwithstanding the added expression, Kirby insists Ulala is no more than a "look-alike, an imitation or emulation or rip-off of Lady Kier's entire persona," co-opted by respondents with the "commercial objective to us[e] Lady Kier's likeness and identity" and to capitalize in the game and its affiliated products on the commercial value attached to her persona. Kirby insists "Ulala is nothing other than a mere emulation of Lady Kier with minor digital enhancements and manipulations." It is not entitled to First Amendment protection because the character fails to "say [anything]—whether factual or critical or comedic—about a public figure." Neither contention has merit.

■ First, for the reasons discussed above, we reject the claim that Ulala merely emulates Kirby. Sufficient similarities preclude a conclusion that, as a matter of law, Ulala was not based in part on Kirby. However, we are similarly unable to conclude, as a matter of law, that Ulala is nothing other than an imitative character contrived of "minor digital enhancements and manipulations." Respondents have added new expression, and the differences are not trivial. Ulala is not a mere imitation of Kirby.

Second, and more importantly, the transformative test specifically does not require the elements Kirby seeks to impose. The law does not require Ulala to "say something—whether factual or critical or comedic" about Kirby the public figure in order to receive First Amendment protection. This argument has been soundly rejected by the Supreme Court. In *Winter*, the court made clear the pivotal issue is whether the work is transformative, not the form of literary expression: "It does not matter what precise literary category the work falls into. What matters is whether the work is transformative, not whether it is parody or satire or caricature or serious social commentary or any other specific form of expression." (*Winter, supra*, 30 Cal.4th at p. 891.) Whether the Ulala character conveys any expressive meaning is irrelevant to a First Amendment defense. (See *Comedy III, supra*, 25 Cal.4th at pp. 399, 403.) All that is necessary is that respondents' work add " 'something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . . .' " (*Id.* at p. 404.) A work is transformative if it adds "new expression." That expression alone is sufficient; it need not convey any "meaning or message." (*Ibid.*) The Ulala character satisfies this test.

■ Kirby alternatively invites us to "refine" the transformative test developed by our Supreme Court, "because its application is confusing and difficult and the result uncertain," or simply to reject the test outright in favor of the "predominant use" test recently adopted by the Missouri Supreme Court in *Doe v. TCI Cablevision* (Mo. 2003) 110 S.W.3d 363, certiorari

denied (2004) 540 U.S. 1106. We decline the invitation. First and foremost, we are bound to follow the decisions of our Supreme Court, not those of another state. (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473 [20 Cal.Rptr.3d 428, 99 P.3d 1015].) "Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court." (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)[6]

Second, we disagree that the transformative test requires refinement or is confusing or difficult—at least in this instance—to apply. The test simply requires the court to examine and compare the allegedly expressive work with the images of the plaintiff to discern if the defendant's work contributes significantly distinctive and expressive content; i.e., is "transformative." If distinctions exist, the First Amendment bars claims based on appropriation of the plaintiff's identity or likeness; if not, the claims are not barred. (*Winter, supra,* 30 Cal.4th at pp. 889–891.) As aptly summed up by the trial court, "any imitation of [Kirby's] likeness or identity in Ulala is not the sum and substance of that character. Rather, the imitation is part of the raw material from which the Ulala character, and SC[5], were synthesized. As in *Winter,* Ulala is a 'fanciful, creative character' who exists in the context of a unique and expressive video game. Similar facts distinguished *Winter* from *Comedy III,* and the same distinction applies here. [Respondents'] portrayal of Ulala is protected by the First Amendment."

Because Kirby's claims are subject to a First Amendment defense, and the video game is protected speech, Kirby's state common law and statutory claims fail. Kirby's Lanham Act claim is also barred. Ulala is not a literal depiction of Kirby. We agree with the trial court that any public confusion that Kirby endorses SC5, based on similarities between her and Ulala, would arise from a false assumption that the game could not contain a character resembling Kirby without her imprimatur. However, unlike the Three Stooges, Ulala is not a literal depiction of Kirby. Thus, given the many dissimilarities between the Ulala character and Kirby, any public confusion arising from a mistaken assumption is easily outweighed by the public interest in free artistic expression, so as to preclude application of the

---

[6] For the same reasons, we reject Kirby's assertion that we should ignore the standard established by *Comedy III* and *Winter,* and the rule that summary judgment is a favored remedy in First Amendment cases, and send the issue of whether respondents' work is "transformative" to the jury, under Judicial Council of California Civil Jury Instructions (2006) CACI No. 1805. This jury instruction applies only if a case presents a factual issue as to whether the defendant has added new expression. In other cases, the Supreme Court has made it clear "courts can often resolve the question as a matter of law simply by viewing the work in question and, if necessary, comparing it to an actual likeness of the person . . . portrayed." (*Winter, supra,* 30 Cal.4th at pp. 891–892.) This case falls squarely into the latter category.

Lanham Act. (See *ETW, supra*, 332 F.3d at p. 937; see also *Hoffman v. Capital Cities/ABC, Inc.* (9th Cir. 2001) 255 F.3d 1180, 1183 [claims for violation of the Lanham Act, common law appropriation action, violation of § 3344, and violation of Bus. & Prof. Code, § 17200 each barred by First Amendment defense].)

### 4. *Respondents are entitled to attorney's fees.*

■    Section 3344, subdivision (a) clearly states that "[t]he prevailing party in any action under this section shall . . . be entitled to attorney's fees and costs." Under this provision, respondents sought approximately $763,000 in attorney's fees and costs, and ultimately received an award of approximately $608,000.[7] Kirby concedes section 3344's directive that fees "shall" be awarded to the prevailing party in a statutory appropriation action is clearly mandatory. Nevertheless, she argues the statute should be applied permissively and only in cases in which the suit is deemed frivolous or brought in bad faith or without substantial justification. Otherwise, she insists, the statute "presents a clear disincentive for plaintiffs to enforce. . . ." Her argument is misdirected. The mandatory fee provision of section 3344, subdivision (a) leaves no room for ambiguity. Whether the course is sound is not for us to say. (*People v. Ireland* (1995) 33 Cal.App.4th 680, 694 [39 Cal.Rptr.2d 870].) This is the course the Legislature has chosen and, until that body changes course, we must enforce the rule. The fee award was proper.

■    Respondents also seek and are entitled to recover attorney's fees on appeal under section 3344, subdivision (a). "Statutory authorization for the recovery of attorney fees incurred at trial necessarily includes attorney fees incurred on appeal unless the statute specifically provides otherwise. [Citation.]" (*Akins v. Enterprise Rent-A-Car Co., supra*, 79 Cal.App.4th at p. 1134; see also *Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 929 [275 Cal.Rptr. 187, 800 P.2d 543] [Stating the "general rule that statutory attorney fee provisions are interpreted to apply to attorney fees on appeal unless the statute specifically provides otherwise"].) Although we could appraise and fix

---

[7] As to the claim for violation of the Lanham Act, the trial court denied respondents attorney's fees, concluding Kirby's action was neither unreasonable nor groundless. (See *Stephen W. Boney, Inc. v. Boney Services, Inc.* (9th Cir. 1997) 127 F.3d 821, 825, 827 [prevailing defendant may be awarded fees in an " 'exceptional case[],' " i.e., one in which plaintiff's claims are groundless, unreasonable, vexatious or pursued in bad faith].) The amount of the fees awarded was reduced after the trial court concluded the amount sought by respondents was not reasonable. However, the court found all of Kirby's state statutory and common law claims "inextricably intertwined," and refused to further apportion the fee award. (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133 [94 Cal.Rptr.2d 448] [When statutory claims providing for fees are combined with claims for which attorney's fees are not available, prevailing party may recover fees only on statutory claim unless claims are so intertwined or pertain to issues common to claims in which fees are properly allowed].) Kirby does not take issue with these rulings.

attorney's fees on appeal, the more appropriate course of practice is to remand the case to the trial court to determine the appropriate amount of fees. (See *Akins*, at p. 1134.)

## DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court for a determination of the amount of an award of attorney's fees to respondents as prevailing parties on this appeal. (§ 3344, subd. (a).) Respondents are awarded costs on appeal.

Cooper, P. J., and Flier, J., concurred.