Filed 12/23/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RICKY D. ROSS, | B242531 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC450511) |
| v. | |
| WILLIAM LEONARD ROBERTS II et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rita Miller, Judge. Affirmed and remanded.

John D. Younesi, Jan A. Yoss for Plaintiff and Appellant.

Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor, Stanton L. Stein, Edward A. Klein, Allen P. Lohse; Caldwell Leslie & Proctor, Linda M. Burrow, Eric S. Pettit for Defendants and Respondents.

_____

Plaintiff and appellant Ricky D. Ross is a former criminal who achieved some sort of celebrity status due, in part, to the enormous scale of his cocaine-dealing operations. Defendant and respondent William Leonard Roberts II is a famous rap musician who goes by the name "Rick Ross." His lyrics frequently include fictional accounts of selling cocaine. Plaintiff sued Roberts and other defendants/respondents (Maybach Music Group, Slip-N-Slide Records, and Universal Music Group) claiming that they misappropriated plaintiff's name and identity for their own financial benefit. Defendants moved for and were granted summary judgment by the trial court.

In this opinion, we find that defendants' use of the "Rick Ross" name and persona is protected expression under the First Amendment because it incorporates significant creative elements. Accordingly, we conclude that summary judgment is appropriate.

## BACKGROUND

### Procedural background

Plaintiff initially filed suit against defendants and several other parties in June 2010 in the United States District Court for the Central District of California, asserting federal and state law claims. Following a motion to dismiss filed by various defendants, the district court dismissed the federal claims in November 2010 and declined to exercise supplemental jurisdiction over the remaining state claims. (28 U.S.C. § 1367(c)(3).)

Plaintiff then filed this action in state court in December 2010. The operative first amended complaint pleaded six causes of action: (1) violation of Civil Code section 3344; (2) false advertising; (3) unjust enrichment; (4) unfair business practices; (5) common law claims of misappropriation of name and identity; and (6) misappropriation of rights of publicity. All causes of action relied on allegations that Roberts and the other defendants misappropriated plaintiff's name and identity to further Roberts's rap music career.

### Evidence presented on the motion for summary judgment

In December 2011, defendants filed a motion for summary judgment. Evidence presented in connection with the motion included the following:

Plaintiff was born Rickie Donnell Ross. Throughout his life, he has gone by the names Ricky Ross and Rick Ross, and was at one time dubbed with the nickname "Freeway" Ricky Ross. During the 1980's, plaintiff organized and ran a vast cocaine-dealing enterprise. His network of associates packaged and transported cocaine for sale directly into at least six different states, and indirectly into many others. At the height of plaintiff's operation, he sold as much as $3 million worth of cocaine a day. He eventually amassed a fortune worth hundreds of millions of dollars, and he owned dozens of properties as well as legitimate businesses.

In 1989, plaintiff was arrested in Ohio and charged with trafficking cocaine and was indicted on separate charges in Texas. He pled guilty to the charges in both Ohio and Texas and received lengthy sentences. While in prison, plaintiff helped to uncover a ring of "dirty cops," who planted evidence and framed innocent people using false evidence. Plaintiff's testimony helped to free approximately 120 wrongly convicted men and he was rewarded with a significantly reduced sentence, leading to his release from prison in 1994.

Just six months after his release, plaintiff was arrested again and subsequently convicted on new charges of conspiracy to traffic cocaine. While plaintiff was in prison this time, a journalist interviewed him and wrote a piece regarding plaintiff's former cocaine supplier, who in the 1980's had close ties to the Nicaraguan Contras. The story gained significant exposure, and in the 1990's plaintiff received widespread coverage regarding his peripheral role in the Iran-Contra scandal. Over the years, plaintiff has also been the subject of numerous television shows focusing on his erstwhile criminal empire.

In 2006, plaintiff discovered that Roberts was using the name "Rick Ross," when he saw a magazine article about "up and coming" rappers. Still in prison, plaintiff contacted a lawyer to write a cease and desist letter, but neither plaintiff nor the lawyer ever received a meaningful response. Plaintiff was eventually released from prison in 2009.

Meanwhile, Roberts lived a life far removed from that of plaintiff. Roberts is a professional rap musician who goes by the stage name Rick Ross. Early in his career, he

3

spoke about how the criminal Ross's life story "grabbed him." Roberts has recently denied, however, that his performing name is based on plaintiff. He claims instead that the name is a play on the phrase "big boss," an old nickname from his high school football days.

Roberts's lyrics frequently include fictional stories about running large-scale cocaine operations. He is a former correctional officer—a piece of information not conducive to his career as a "drug-dealing rapper," and one that he has attempted to hide. In approximately 2005, Roberts released his first commercial single, "Hustlin'," in which he rapped about selling cocaine and which repeated the refrain "everyday I'm hustlin'," a phrase previously used by plaintiff in interviews when describing his life as a criminal. Roberts's first commercial CD, Port of Miami, was released in 2006. Since that time, he has released numerous additional albums and has achieved tremendous commercial success. His music has been produced, distributed, and/or sold by defendants Maybach Music Group, Slip-N-Slide Records, and Universal Music Group.

**Contentions and the trial court's ruling**

In moving for summary judgment, defendants argued that plaintiff's causes of action were barred by the statute of limitations. Defendants contended that the statute of limitations began to run at latest in 2005, upon the first commercial use by Roberts of the name Rick Ross, and that the "single publication rule" (codified by Civ. Code, § 3425.3[1]) prevented plaintiff from seeking damages for any subsequent use of his name or persona. Defendants further argued that plaintiff's action was barred by the doctrine of laches.

---

[1]  Civil Code section 3425.3 states: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions."

Plaintiff opposed defendants' motion, arguing that the single publication rule did not foreclose his claims because, at a minimum, each new album released by defendants constituted a new and separate publication.

The trial court accepted defendants' argument. It found that Roberts's first use of the name Rick Ross occurred no later than 2005, and that plaintiff's claims all accrued at that time. According to the trial court, Roberts's subsequent uses of the name Rick Ross did not constitute further actionable publications and, in any event, plaintiff's claims were barred by laches.

Although we are not convinced that the trial court's rulings on either of these grounds were correct, we need not analyze them at length, because, as discussed below, we conclude defendants' First Amendment rights provide a complete defense to all of plaintiff's claims.

## DISCUSSION

### I. Review

Under Code of Civil Procedure section 437c, subdivision (c), a motion for summary judgment shall be granted if all the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. A defendant meets its burden on summary judgment by establishing a complete defense to the plaintiff's causes of action. (Code Civ. Proc., § 437c, subd. (p)(2).) The burden then shifts to the plaintiff to show a triable issue of fact material to the defense. (*Ibid.*) We evaluate a summary judgment ruling de novo, independently reviewing the record to determine whether there are any triable issues of material fact. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) "In practical effect, we assume the role of a trial court and apply the same rules and standards that govern a trial court's determination of a motion for summary judgment." (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1258.) In general, we give no deference to the trial court's ruling or reasoning, and only decide whether the right result was reached. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

On appeal, defendants argue, inter alia, that summary judgment is proper because Roberts's "work"—his music and his professional persona as a drug-dealing rapper who goes by the name Rick Ross—is a creative expression protected by the First Amendment. Defendants did not make this argument when moving for summary judgment in the trial court, an omission which, generally, would preclude us from deciding the issue on appeal. (See *Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 71.) Consideration of the issue is appropriate, however, if the record establishes that the opposing party "could not have shown a triable issue of material fact had the ground of law been asserted by the moving party." (*Ibid.*; see also *Folberg v. Clara G. R. Kinney Co.* (1980) 104 Cal.App.3d 136, 140; *California School of Culinary Arts v. Lujan* (2003) 112 Cal.App. 4th 16, 26.)

Several points lead us to conclude that deciding the effect of defendants' First Amendment argument here is appropriate. First, such an issue can often be resolved as a matter of law and is usually appropriate for summary judgment, or occasionally even demurrer. (*Winter v. DC Comics* (2003) 30 Cal.4th 881, 891-892 (*Winter*).) As we find below, given the facts of this case, the First Amendment defense applies as a matter of law. Second, "[i]n cases involving free speech, a speedy resolution is desirable because protracted litigation may chill the exercise of First Amendment rights. For that reason, summary judgment is a favored remedy in free speech cases." (*Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 54 (*Kirby*); *Winter*, at pp. 891-892.) If we were to disregard the First Amendment defense and reverse the judgment, it is likely that a further appeal would ensue following the trial court's eventual consideration of the issue, leading to anything but a speedy resolution. Third, plaintiff requested and was granted leave by this Court to brief the issue; he thus has had an adequate opportunity to explain either how the defense does not apply or how it requires resolution of disputed material facts. (See *Juge v. County of Sacramento*, *supra*, 12 Cal.App.4th at p. 70 [party opposing motion for summary judgment must be given opportunity to respond to ground upon which summary judgment is decided].) Given all of these reasons, and because the record establishes that plaintiff is unable to show a triable issue of material fact relevant

to defendants' First Amendment defense, the interests of justice dictate that we decide the issue at this stage.

## II. Right of Publicity

Plaintiff's causes of action are all based on the theory that Roberts misappropriated plaintiff's name and identity for Roberts's and the other defendants' commercial advantage. Plaintiff contends that defendants are liable under Civil Code section 3344, as well as common law rights of publicity and related claims.

The right of publicity protects an individual's right to profit from the commercial value of his or her identity. (*Gionfriddo v. Major League Baseball* (2001) 94 Cal.App.4th 400, 409; *Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 544.) California recognizes both a common law and statutory right of publicity. (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 391 (*Comedy III*).) The common law cause of action may be stated by pleading: the defendant's unauthorized use of the plaintiff's identity; the appropriation of the plaintiff's name, voice, likeness, signature, or photograph to the defendant's advantage, commercially or otherwise; and resulting injury. (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 417; *Kirby*, *supra*, 144 Cal.App.4th 47, 55.) The statutory right, enacted in 1971, was intended to complement this common law right of publicity. (*Comedy III*, at p. 391; *Eastwood,* at pp. 416-417; *Kirby,* at p. 55.) It provides, in pertinent part: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." (Civ. Code, § 3344, subd. (a).)

## III. Defendants' First Amendment Defense

### A. The Transformative Test

As our Supreme Court explained in *Comedy III*, a tension exists between rights of publicity and rights of free speech and expression under the First Amendment. (*Comedy III*, *supra*, 25 Cal.4th 387, 396-397.) Purposes of the First Amendment include

preserving an uninhibited marketplace of ideas and fostering individual rights of self-expression. (*Comedy III*, at p. 397.) A right of publicity has the potential to frustrate these purposes, as it can lead to suppression of individual expression and censorship of the public display of ideas. (*Ibid.*)

Our Supreme Court thus devised a test to "balance" the right of a celebrity to control the commercial exploitation of his or her likeness and identity against another individual's right to free expression under the First Amendment. (*Comedy III*, *supra*, 25 Cal.4th at p. 391; *Winter*, *supra*, 30 Cal.4th at p. 885; see also *Kirby*, *supra*, 144 Cal.App.4th 47, 58.) The test is based on an examination of "'whether the new work merely "supersede[s] the objects" of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message. . . . [Citation.]'" (*Comedy III*, at p. 404.)

The central inquiry is whether a work is "'transformative.'" (*Comedy III*, *supra*, 25 Cal.4th at p. 404.) "When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist." (*Id.* at p. 405, fn. omitted.) But, "when a work contains significant transformative elements, it is not only especially worthy of First Amendment protection, but it is also less likely to interfere with the economic interest protected by the right of publicity. . . . [W]orks of parody or other distortions of the celebrity figure are not, from the celebrity fan's viewpoint, good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets for celebrity memorabilia that the right of publicity is designed to protect. [Citation.] Accordingly, First Amendment protection of such works outweighs whatever interest the state may have in enforcing the right of publicity." (*Ibid.*)

Simply stated, the transformative test looks at "whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in

8

question. We ask, in other words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness." (*Comedy III*, *supra*, 25 Cal.4th at p. 406.) This transformative test is the court's primary inquiry when resolving a conflict between the right of publicity and the First Amendment.

A "subsidiary inquiry" that courts may employ, particularly in close cases, is to ask whether "the marketability and economic value of the challenged work derive primarily from the fame of the celebrity." (*Comedy III*, *supra*, 25 Cal.4th at p. 407.) If the answer to this question is "no," and if the value of the work instead derives from the creativity, skill, or reputation of the artist, then the First Amendment protects against a right of publicity claim. (*Comedy III*, at p. 407.) "In sum, when an artist is faced with a right of publicity challenge to his or her work, he or she may raise as affirmative defense that the work is protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame." (*Ibid.*)

The issue addressed in *Comedy III* was whether an artist's drawings of the Three Stooges, which were little more than literal reproductions of their likenesses sold as lithographs and on T-shirts, qualified as artworks protected by the First Amendment. The Supreme Court answered the question in the negative. (*Comedy III*, *supra*, 25 Cal.4th at pp. 408-409.) In contrast, in *Winter*, the court found that comic book illustrations depicting the musician brothers Johnny and Edgar Winter as half human and half worm were sufficiently transformative to qualify for First Amendment protection. (*Winter*, *supra*, 30 Cal.4th at pp. 890-891.)

Both *Comedy III* and *Winter* involved visual representations of celebrity individuals, as have a number of other cases in which the First Amendment intersected with the right of publicity. (See *Kirby*, *supra*, 144 Cal.App.4th at pp. 59-60 [video game character resembling lead singer of a prominent musical band was transformative and thus protected]; *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, [video game containing literal reproductions of popular band members was not

9

protected]; (*Keller v. Elec. Arts Inc. (In re NCAA Student-Athlete Name & Likeness Licensing Litig.)* (9th Cir. Cal. 2013) 724 F.3d 1268, 1270 [video games that "literally recreates" college athletes "in the very setting in which [they] achieved renown" not entitled to 1st Amend. protection].) The First Amendment defense does not apply only to visual expressions, however. "The protections may extend to all forms of expression, including written and spoken words (fact or fiction), music, films, paintings, and entertainment, whether or not sold for a profit." (*Kirby*, at p. 58; see also *Comedy III*, *supra*, 25 Cal. 4th at p. 406.)

## B. Application

Applying the transformative test to the facts of this case, we find that the First Amendment provides a complete defense to all of plaintiff's claims.[2] As in *Winter*, where the Supreme Court found that application of the test to the case was "not difficult" (*Winter*, *supra*, 30 Cal.4th 881, 890), the validity of defendants' First Amendment defense here is quite obvious. We recognize that Roberts's work—his music and persona as a rap musician—relies to some extent on plaintiff's name and persona. Roberts chose to use the name "Rick Ross." He raps about trafficking in cocaine and brags about his wealth. These were "'raw materials'" from which Roberts's music career was synthesized. But these are not the "very sum and substance" of Roberts's work. (See *Comedy III*, *supra*, 25 Cal.4th 387, 406.)

Roberts created a celebrity identity, using the name Rick Ross, of a cocaine kingpin turned rapper. He was not simply an imposter seeking to profit solely off the name and reputation of Rick Ross. Rather, he made music out of fictional tales of dealing drugs and other exploits—some of which related to plaintiff. Using the name and certain details of an infamous criminal's life as basic elements, he created original artistic

_____

[2]     Plaintiff and defendants differ on the issue of whether Roberts appropriated plaintiff's name and identity. For purposes of this appeal, we assume that such appropriation did occur, because if there was no appropriation, plaintiff's claims—which are all premised on the theory that Roberts misappropriated plaintiff's name and identity—would fail anyway.

works. "A work is transformative if it adds 'new expression.'" (*Kirby*, *supra*, 144 Cal.App.4th at p. 60, citing *Comedy III*, *supra*, 25 Cal.4th at p. 404.) Roberts's work clearly added new expression.

*Comedy III*'s "subsidiary inquiry" also supports application of the First Amendment defense. Although it is possible that Roberts initially gained some exposure through use of the name Rick Ross and the reputation it carried, the value of Roberts's work does not derive primarily from plaintiff's fame. (See *Comedy III*, *supra*, 25 Cal.4th at p. 407.) The economic value of Roberts's work is reflected to a large extent by the number of CD's and records he sells. It can safely be assumed that when individuals purchase music, they generally do so in order to listen to music that they enjoy. It defies credibility to suggest that Roberts gained success primarily from appropriation of plaintiff's name and identity, instead of from the music and professional persona that he (and the other defendants) created.

Relying on *Estate of Fuller v. Maxfield & Oberton Holdings, LLC* (N.D.Cal. 2012) 906 F.Supp.2d 997 (*Fuller*), plaintiff argues that the First Amendment defense only applies in a right of publicity case when the alleged misappropriation is of a "likeness" (i.e., a person's visual image), not a name. In *Fuller*, Buckminster Fuller's estate sued the manufacturer of toys called "Buckyballs," which, according to the defendant's press release, were "inspired and named after [the] famous architectural engineer and inventor" Buckminster Fuller; the toys, which consisted of round magnets, could be manipulated to resemble the Carbon-60 molecule, commonly referred to as the "buckyball" molecule. (*Id.* at p. 1002.) The district court identified two reasons that the manufacturer's First Amendment defense failed. First, the cases on which the manufacturer relied, such as *Comedy III*, *Kirby*, and *Winter*, all addressed the use of a plaintiff's likeness, instead of only a name. (*Fuller*, at p. 1006.) According to the *Fuller* court, "[t]his distinction is a meaningful one, as the reasoning of the cases that articulate the transformative use defense depends on the visual nature of the transformation. . . . The simple use of a name is not an act of expression in the way that the creation or alteration of an image is, and a name cannot be transformed while remaining

11

recognizable in the way that an image can." (*Ibid.*) Second, Fuller's "name and identity" were not part of the actual product the manufacturer was selling—the toys did not depict or reference Fuller. (*Ibid.*) The court found no First Amendment protection "for the use of a celebrity's name, transformed or otherwise, to sell an unrelated product." (*Ibid.*)

We believe that *Fuller*'s emphasis on the "visual nature" of the First Amendment defense in right of publicity cases can be misleading, since it previously has been held that First Amendment protection "extend[s] to all forms of expression," including words (written or spoken) and music. (*Kirby*, *supra*, 144 Cal.App.4th at p. 58; see also *Comedy III*, *supra*, 25 Cal. 4th at p. 406.) Indeed, the instant case is one in which there was no appropriation of something visual, such as a likeness, but the First Amendment defense still applies. The differences between this case and *Fuller* are significant. In *Fuller*, the defendant used the plaintiff's name to sell an unrelated product. (*Fuller*, *supra*, 906 F.Supp.2d at p. 1006.) Here, Roberts created music by adding significant transformative elements to the base components of plaintiff's name and identity.[3] In *Fuller*, the product was in no way a transformed portrayal of the famous engineer and inventor. (*Id*. at p. 1002.) In contrast, the rapper "Rick Ross" is a highly altered, essentially fantasized version of plaintiff.

Our holding that defendants are protected by the First Amendment is consistent with our Supreme Court's guidance on the issue. *Comedy III* noted how books (which, generally, do not contain visual depictions) can receive First Amendment protection. (*Comedy III*, *supra*, 25 Cal.4th at p. 408.) Furthermore, in *Winter*, the Supreme Court emphasized the point that the distorted depictions of the plaintiff Winter brothers were merely cartoon characters "in a larger story, which is itself quite expressive." (*Winter*, *supra*, 30 Cal.4th at p. 890.) Roberts's music may be analogized to a work of fiction in

---

[3]      Unauthorized use of a plaintiff's identity is an element of a common law right of publicity claim, which Civil Code section 3344 (prohibiting unauthorized appropriation of a plaintiff's name) complements. (*Comedy III*, *supra*, 25 Cal.4th at p. 391; *Eastwood v. Superior Court*, *supra*, 149 Cal.App.3d 409, 417.)

which the protagonist bears some resemblance to the original Rick Ross. The resemblance is one "raw material" upon which the story is based, but it is merely a minor detail when viewed in the context of the larger story—Roberts's music and persona are much more than literal depictions of the real Rick Ross.

For all of these reasons, we find that defendants' expression was transformative, and they are entitled to summary judgment.

## IV. **Attorney Fees**

Civil Code section 3344, subdivision (a) provides that the prevailing party in any action under the section shall be entitled to attorney fees and costs. Defendants moved for and were awarded fees and costs in the trial court, a ruling that plaintiff requests we reverse in the event we find summary judgment improper. Because we affirm the judgment, we do not reverse the fees and costs award.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to their fees and costs on appeal, in an amount to be determined by the trial court on remand.

CERTIFIED FOR PUBLICATION.


                                        BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*

_____

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.

13